# In the United States Court of Federal Claims

No. 14-296L

(Filed: February 24, 2016)

| | |
|---|---|
| *********************************** | Indian breach-of-trust case; standing of heirs to challenge BIA's actions respecting estate assets; motion to dismiss for failure to state a claim; RCFC 12(b)(6); time of vesting of heirs' property interests; BIA's money-mandating fiduciary duties in entering and approving leases of Indian agricultural lands and mineral rights |
| **SUSAN FREDERICKS, et al.,** | |
| **Plaintiff,** | |
| v. | |
| **UNITED STATES,** | |
| **Defendant.** | |
| *********************************** | |

Terry L. Pechota, Rapid City, South Dakota, for plaintiff. With him at the hearing was John Fredericks III, Fredericks Peebles & Morgan, Mandan, North Dakota.

Adam M. Bean, Trial Attorney, Environment & Natural Resources Division, United States Department of Justice, Washington, D.C., for defendant. With him on the briefs were John C. Cruden, Assistant Attorney General, and Stephen R. Terrell, Trial Attorney, Land & Natural Resources Division, United States Department of Justice, Washington, D.C., and Holly H. Clement, Office of the Solicitor, United States Department of the Interior, Washington, D.C.

**OPINION AND ORDER**

LETTOW, Judge.

Five Indian heirs to their deceased father's allotted lands have filed this breach of trust case, contesting actions taken by the Department of the Interior's Bureau of Indian Affairs ("BIA") regarding the estate's lands and assets. After the death of plaintiffs' father in 2006, BIA began probate proceedings, which lasted until 2013. The plaintiffs allege that during probate, and continuing to this day, the United States improperly granted and approved leases of their father's land in violation of trust duties imposed by the Fort Berthold Mineral Leasing Act, Pub. L. No. 105-188, 112 Stat. 620 (1998), as amended by Pub. L. No. 106-67, 113 Stat. 979 (1999), and the American Indian Agricultural Resource Management Act ("AIARMA"), Pub. L. No. 103-177, 107 Stat. 2011 (1993) (codified as amended at 25 U.S.C. §§ 3701-46). They also allege a taking of property without just compensation in contravention of the Fifth Amendment. Pending before the court is the United States' ("government's") motion to dismiss under Rules 12(b)(1) and 12(b)(6) of the Rules of the Court of Federal Claims ("RCFC"). *See* Def.'s Mot. to Dismiss ("Def.'s Mot."), ECF No. 25. The government's principal arguments are that the Indian heirs lack standing because they had no property interests until the conclusion of probate, and

that pertinent statutes impose no money-mandating duties on the government in favor of the heirs.  A hearing was held on January 8, 2016, and the government thereafter filed a supplemental brief on January 19, 2016.

## BACKGROUND

A. *The Plaintiffs' Father Died Intestate, and the Government Probated His Estate*

John Fredericks, Jr., died on December 27, 2006 in Bismarck, North Dakota.  Am. Compl. ¶ 5.  During his life, he married three times.  His second wife was Candace Bridges, with whom he had five children: Susan, John III, Casey, Mary, and Shawn Fredericks.  Am. Compl. ¶ 6.  These five children are the plaintiffs.[1]  At some point, decedent's marriage to Candace Bridges ended, and he married Judy Fredericks, with whom he had three children, two of whom are heirs: Kathy Johnson and Frederick Fredericks.  Am. Compl. ¶ 7.[2]  His marriage to Judy lasted until his death.

Mr. Fredericks was an enrolled member of the Three Affiliated Tribes of the Fort Berthold Indian Reservation in North Dakota, as were and are his children and his wife Judy.  Am. Compl. ¶ 8.  When he died, he owned interests in 3,477 acres of allotted land in or around the reservation.  Am. Compl. ¶¶ 9, 37.  Those allotments were held in trust for him by the United States.  Am. Compl. ¶ 9; Def.'s Mot. at 13 (acknowledging decedent's "trust and restricted fee status land").  By law and regulation, an Indian owner of allotted lands can execute a will bequeathing his or her interests in allotted lands.  *See* 25 C.F.R. § 15.3.  Nonetheless, Mr. Fredericks left no will.  Am. Compl. ¶ 10.

In the absence of a will, BIA began intestate probate proceedings to distribute Mr. Fredericks' allotted lands and assets to his heirs.  Am. Compl. ¶ 11.  On June 20, 2009, Probate Judge James Yellow Tail ruled that Judy as surviving spouse had a life estate in all trust real estate in which decedent's interest equaled or exceeded 5%.  Probate Decision ¶ 9(a)(i); Am. Compl. ¶ 11.  As for the remainder after the expiration of the life estate, the Probate Judge ruled that the seven children who were heirs held an equal one-seventh undivided interest.  Probate Decision ¶ 9(a)(i); Am. Compl. ¶ 11.  In addition, as the oldest child, Susan was awarded decedent's interest in all trust lands in which his interest was less than 5%.  Probate Decision ¶ 9(a)(ii); Am. Compl. ¶ 11.  Probate Judge Yellow Tail denied a petition for rehearing on May

---

[1]To avoid confusion, the court refers to these individuals by their first names, and to Mr. Fredericks, Jr., as simply Mr. Fredericks.

[2]Mr. Fredericks had two further children, Joseph Wade Fredericks Banta, a son of Mr. Fredericks and his first wife, Joann Christianson, and Gary Mark Fredericks, a son of Mr. Fredericks and his third wife Judy.  *See In re Estate of John Fredericks, Jr.*, Case No. P 0000 4752 1P (Interior Office of Hearings and Appeals June 20, 2009), reproduced at Pls.' Resp. to Mot. to Dismiss ("Pls.' Opp'n") Ex. 2 ("Probate Decision") ¶ 3, ECF No. 30-2.  Because Joseph and Gary were both legally adopted by other parents prior to the death of Mr. Fredericks, they could not be and were not considered heirs of his estate.  *Id.*

31, 2011.  Am. Compl. ¶ 21.  The plaintiffs then appealed the decision to the Interior Board of Indian Affairs, which on July 11, 2013 affirmed Judge Yellow Tail's rulings.  Am. Compl. ¶¶ 22, 23.

    B.  *During and After Probate of Decedent's Estate, BIA Permitted Various Activities on the Decedent's Allotted Lands*

The plaintiffs' claims arise out of events occurring during and after the probate proceedings regarding Mr. Fredericks' estate.

    1.  *BIA permitted Judy to enter an oil lease while the estate was in probate.*

On February 4, 2008, Judy signed an oil and gas lease (the "Oil Lease") with an oil company, permitting exploration and drilling on one of the decedent's parcels located in the Fort Berthold Reservation.  Am. Compl. ¶ 12.[3]  BIA approved the Oil Lease almost three months later, on April 23, 2008, even though the heirs of Mr. Fredericks had not yet been determined in probate.  Am. Compl. ¶ 13.  The Oil Lease has led to three oil wells on the land, which to date have generated royalties in excess of $1,000,000.  Am. Compl. ¶ 15.  BIA has not paid the heirs, either Judy or the plaintiffs, any bonuses, royalties, or other proceeds from this lease.  Am. Compl. ¶ 45.  On July 23, 2013, plaintiffs requested that BIA segregate income from the Oil Lease and distribute it in accord with the Fort Berthold Mineral Leasing Act.  Am. Compl. ¶ 30.

    2.  *BIA authorized Judy to enter a grazing lease with a third party, and that third party allegedly caused damage to the land.*

While the probate proceedings were pending, in 2009 and 2010, BIA granted Judy a revocable grazing permit to use decedent's allotted trust land.  Am. Compl. ¶ 16.  Judy in turn entered an agreement with Garvin Gullickson, a non-Indian, allowing him to pasture his cattle on the allotted lands.  Am. Compl. ¶ 17.  Mr. Gullickson then allegedly grazed livestock on the land, removed grass and other forage, dug up a spring, destroyed a stock tank, and despoiled two water sources on the land, "causing a diminution in [the] flow of creeks on the land."  Am. Compl. ¶ 18.  Plaintiffs did not know about the permit granted to Judy or her agreement with Mr. Gullickson prior to their issuance.  Am. Compl. ¶ 16.[4]  The record before the court does not disclose the term of Judy's lease to Mr. Gullickson.

---

[3]The parcel is located within the Bakken shale formation and is identified as Allotment 1029A-A, Township 147 North, Range 39 West, 5th Principal Meridian, Dunn County, North Dakota.  The ownership of the mineral interest in the parcel has recently been disputed by the government.  *See infra*, at 4, 7.

[4]Prior to the issuance of a permit to Judy, the plaintiffs had put the BIA on notice that they desired that the land be leased to Casey for his ranching business.  Am. Compl. ¶ 16.

3. *BIA denied plaintiffs' request to permit Casey to lease and use the land.*

On July 6, 2012, plaintiffs requested BIA's approval of an agricultural lease to Casey. Am. Compl. ¶ 27. The BIA did not take action on the request. Am. Compl. ¶ 28. The plaintiffs submitted the request again on November 18, 2013. Am. Compl. ¶ 28. On March 28, 2014, the BIA superintendent for the Fort Berthold Agency denied the proposed lease to Casey, and on March 10, 2015, the regional director affirmed the denial. Am. Compl. ¶ 29. Plaintiffs appealed that denial to the Interior Board of Indian Appeals on March 30, 2015, and that appeal is pending. Am. Compl. ¶ 29.

4. *With BIA approval, Judy leased 2,646 acres of the lands to a third party.*

On or about June 2015, Judy leased 2,646 acres of land to a non-Indian third party. Am. Compl. ¶ 31. The lease caused the plaintiffs to be excluded from the land. Am. Compl. ¶ 31. The BIA approved the lease over the objection of the plaintiffs. Am. Compl. ¶ 31.

5. *BIA inventoried the decedent's estate during probate, and plaintiffs disagree with the inventory.*

During probate proceedings, BIA made an inventory of the assets in the plaintiffs' father's estate. *See* Am. Compl. ¶ 32. On June 15, 2015, the plaintiffs objected to the BIA's conclusions respecting the inventory and "[n]o decision has [yet] been made on plaintiffs' objections." Am. Compl. ¶ 34. BIA has also questioned the inventory. *See infra*, at 7.

C. *Procedural Posture*

Plaintiffs have filed three administrative appeals with the Department of the Interior since 2013, all of which remain pending. At the Interior Board of Indian Appeals (the "Board" or "IBIA"), the plaintiffs seek income from the Oil Lease and reconsideration of BIA's inventory of their father's estate. Am. Compl. ¶¶ 30, 34. In connection with this appeal, BIA has asserted that the decedent did not own the mineral rights to the land on which the Oil Lease is located and thus that those mineral rights are not part of the decedent's estate. Hr'g Tr. 65:2 to 69:24 (Jan. 8, 2016), ECF No. 42.[5] The Board is also reviewing the BIA's decision in 2015 to deny an agricultural lease to Casey. Am. Compl. ¶ 29.

Plaintiffs filed this action on April 14, 2014, and subsequently they requested a stay of proceedings pending resolution of appeals before the IBIA. Pls.' Mot. to Stay, ECF No. 8. The United States opposed the stay, arguing that plaintiffs' claims of breach of fiduciary duty and uncompensated takings did not overlap with the appeals and any stay would be indefinite in duration and thus inappropriate, given the lack of predictability of the time when administrative decisions on the appeals might be rendered. Def.'s Opp'n to Pls.' Mot. for Stay, at 3-4, ECF No. 9. On June 10, 2015, plaintiffs indicated they would file an amended complaint, and the court then denied the motion to stay without prejudice to renewal. Order of June 10, 2015, ECF No.

---

[5]The date will be omitted from subsequent citations to the transcript of the hearing on the pending motion.

21. On July 10, 2015, plaintiffs filed an amended complaint asserting five counts, but they did not renew their request for a stay. Count One alleges a violation of the Fort Berthold Mineral Leasing Act and an illegal exaction. Am. Compl. ¶¶ 45, 46. Count Two alleges a breach of fiduciary duty by BIA as trustee of plaintiffs' interest in lands. Am. Compl. ¶ 59. Count Three alleges a violation of the AIARMA. Am. Compl. ¶ 71. Count Four encompasses a variety of takings theories under the Fifth Amendment. Am. Compl. ¶¶ 73-82. Finally, Count Five alleges the government breached the American Indian Trust Fund Management Reform Act of 1994, Pub. L. No. 103-412, 108 Stat. 4239 (codified in scattered sections of title 25, including 25 U.S.C. §§ 4001, 4043), as well as trust duties attendant to this statute, by improperly inventorying their father's estate. Am. Compl. ¶¶ 83-85. On August 14, 2015, the United States filed its motion to dismiss plaintiffs' amended complaint. That motion was fully briefed and addressed at the hearing held on January 8, 2016, and in the government's supplemental brief filed January 19, 2016.

## STANDARDS FOR DECISION

### A. *Subject Matter Jurisdiction*

A defendant may challenge this court's subject matter jurisdiction by filing a motion pursuant to RCFC 12(b)(1). Plaintiffs bear the burden of establishing subject matter jurisdiction. *Fidelity & Guar. Ins. Underwriters, Inc. v. United States*, 805 F.3d 1082, 1087 (Fed. Cir. 2015); *Brandt v. United States*, 710 F.3d 1369, 1373 (Fed. Cir. 2013); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988). While a party may put subject matter jurisdiction at issue by motion, the court may also raise the issue *sua sponte*, pointing out potential jurisdictional defects that the parties may have failed to discern. If the court at any time determines it lacks jurisdiction, the case must be dismissed, RCFC 12(h)(3), or transferred to a federal court that would have jurisdiction, 28 U.S.C. § 1631.

A court deciding a motion under RCFC 12(b)(1) must determine whether jurisdiction is proper without reaching the merits. *See Caraway v. United States*, 123 Fed. Cl. 527, 529 (2015) (citing *Greenlee Cnty. v. United States*, 487 F.3d 871, 876 (Fed. Cir. 2007)). "Only after this initial inquiry is completed and the Court of Federal Claims takes jurisdiction over the case does it consider the facts specific to the plaintiff's case to determine 'whether on the facts [the plaintiff's] claim f[alls] within the terms of the statutes.'" *Greenlee*, 487 F.3d at 876 (quoting *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005)).

### B. *Failure to State a Claim*

The defendant may seek dismissal of a complaint for failure to state a claim upon which relief could be granted. RCFC 12(b)(6). In that regard, the court accepts as true the complaint's "well-pleaded factual allegations" and then determines whether the complaint alleges facts "'plausibly suggesting (not merely consistent with)' a showing of entitlement to relief." *Dimare Fresh, Inc. v. United States*, 808 F.3d 1301, 1306 (Fed. Cir. 2015) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007), and citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)), *petition for cert. filed* (No. 15-944).

**JURISDICTION**

A. *Subject Matter Jurisdiction*

This court has jurisdiction pursuant to the Tucker Act, 28 U.S.C. § 1491(a)(1), and Indian Tucker Act, 28 U.S.C. § 1505, over claims for breach of fiduciary duty where those claims are grounded in sources of law that impose specific fiduciary duties on the government and that can fairly be interpreted as mandating compensation for damages sustained as a result of such breach. *United States v. Mitchell*, 445 U.S. 535, 542-44 (1980). Given the government's statutory and regulatory responsibility for granting and approving leases and monitoring adherence to and performance of leases, *see infra*, at 14-17; *see also Wilkinson v. United States*, 440 F.3d 970, 975-79 (8th Cir. 2006) (addressing alleged deprivation of rental income derived from leases of Indian trust land in the Fort Berthold Reservation), the court has determined that the statutes and regulations at issue in this case impose fiduciary duties upon the government that are money-mandating in redressing a breach. *See*, *e.g.*, *United States v. Jicarilla Apache Nation*, 564 U.S. __, 131 S. Ct. 2313, 2325 (2011) ("The [g]overnment assumes Indian trust responsibilities only to the extent it expressly accepts those responsibilities by statute."); *see also United States v. Navajo Nation*, 556 U.S. 287 (2009); *United States v. White Mountain Apache Tribe*, 537 U.S. 465 (2003). Accordingly, the court has jurisdiction.

B. *Exhaustion of Administrative Remedies*

Because plaintiffs are pursuing administrative appeals, the court *sua sponte* raises the issue of exhaustion. That doctrine is one which, along with abstention, finality, and ripeness, can "govern the timing of federal-court decisionmaking." *McCarthy v. Madigan*, 503 U.S. 140, 144 (1992), *superseded by statute on other grounds*, Prison Litigation Reform Act of 1995, Pub. L. No. 104-134, 110 Stat. 1321-71 (1996) (codified as amended at 42 U.S.C. § 1997e, et seq.), *as recognized in Woodford v. Ngo*, 548 U.S. 81, 84-85 (2006). As a general matter, "no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." *Rollock Co. v. United States*, 115 Fed. Cl. 317, 329 (2014) (quoting *Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 50-51 (1938)) (quotation marks omitted). The doctrine of exhaustion encompasses two sub-doctrines: (1) statutory exhaustion and (2) prudential exhaustion. *See McCarthy*, 503 U.S. at 144; *see also Lins v. United States*, 688 F.2d 784, 786-87 (Ct. Cl. 1982) (Friedman, C.J.) (describing this distinction in terms of "mandatory" versus "permissive administrative remedies"). Statutory exhaustion is jurisdictional, but prudential exhaustion is not. *Omni Moving & Storage of Virginia, Inc. v. United States*, 21 Cl. Ct. 224, 230 (1990); *see also Mitchell v. United States*, 229 Ct. Cl. 1, 18 (1981) (finding government waived prudential exhaustion by failing to raise the issue), *aff'd*, *United States v. Mitchell*, 463 U.S. 206 (1983).

Statutory exhaustion is required "where Congress specifically mandates" it, *McCarthy*, 503 U.S. at 144, with "sweeping and direct statutory language indicating that there is no federal jurisdiction prior to exhaustion, or the exhaustion requirement is treated as an element of the underlying claim." *Elk v. United States*, 70 Fed. Cl. 405, 407 (2006) (quoting *Avocados Plus Inc. v. Veneman*, 370 F.3d 1243, 1248 (D.C. Cir. 2004)). Each of the administrative appeals in this case concern subjects as to which there is no statutory command that an appeal must be

pursued to resolution before the administrative action becomes susceptible to judicial consideration. Consequently, the court will focus on prudential exhaustion.

Prudential exhaustion is a matter of judicial discretion, in which the court considers the "twin purposes of protecting administrative agency authority and promoting judicial efficiency." *White & Case LLP v. United States*, 67 Fed. Cl. 164, 170 (2005) (quoting *McCarthy*, 503 U.S. at 145). This requires the court "to balance the interests of the individual, which favor prompt access to a judicial forum . . . against countervailing institutional interests." *Rollock*, 115 Fed. Cl. at 332 (citing *McCarthy*, 503 U.S. at 146; *Elk*, 70 Fed. Cl. at 408). In addressing that balance, the court considers "three broad sets of circumstances" that can weigh against requiring prudential exhaustion. *McCarthy*, 503 U.S. at 146. "First, requiring resort to the administrative remedy may occasion undue prejudice to subsequent assertion of a court action. Such prejudice may result, for example, from an unreasonable or indefinite timeframe for administrative action." *Id.* at 146-47. "Second, an administrative remedy may be inadequate 'because of some doubt as to whether the agency was empowered to grant effective relief.'" *Id.* at 147 (quoting *Gibson v. Berryhill*, 411 U.S. 564, 575 n.14 (1973)). "Third, an administrative remedy may be inadequate" where the agency is "biased" or has "predetermined the issue before it." *Id.* at 148.

Applying prudential exhaustion standards, the court concludes that it would be imprudent now for the court to proceed with Count One or those aspects of Count Two premised upon the Fort Berthold Mineral Leasing Act. During the hearing on the pending motion, the court learned for the first time that BIA was seeking an administrative determination that plaintiffs' father did not own the mineral rights attendant to the land on which the Oil Lease is situated. Hr'g Tr. 65:2 to 69:24. If decedent did not own the mineral rights, then neither do his heirs, meaning this aspect of the case could be moot. Moreover, plaintiffs have not alleged any agency bias, nor, having already filed their claims in this court, is there any danger that a statute of limitations would run and bar their claims.

The court also finds it would be imprudent to proceed with Count Three, to the extent it seeks damages for BIA's denial of a lease to Casey on March 28, 2014, and with Count Five. As with the Fort Berthold Mineral Leasing Act claims, plaintiffs allege no agency bias nor prejudice that would result from the court's temporarily staying its hand while awaiting the results of the pending administrative appeals.

In cases such as this, where plaintiffs present both exhausted and unexhausted claims, the court may proceed with the exhausted claims alone. *See Cooper v. Marsh*, 807 F.2d 988, 992 (Fed. Cir. 1986) (remanding case to district court to proceed with exhausted claims only). Because "Tucker Act claims are subject to a six-year limitations period," a "per se rule of 'total exhaustion' . . . requiring dismissals of complaints containing some claims not previously reviewed by [the agency] could work an undue hardship on plaintiffs for whom the limitations period had run." *Id.* at 991-92 (quoting *Rose v. Lundy*, 455 U.S. 509, 513 (1982)). For this reason, the court also should not dismiss claims that have not been prudentially (permissively) exhausted. Instead, the court may enter a stay. *See Brighton Village Assocs. v. United States*, 52 F.3d 1056, 1060 (Fed. Cir. 1995) (concluding that the Court of Federal Claims may stay proceedings pending prudential administrative appeal, permitting plaintiff to file suit within statute of limitations period). Accordingly, the court will not now proceed to consider Count

One, Count Two to the extent it concerns the Fort Berthold Mineral Leasing Act, Count Three to the extent it seeks damages for BIA's denial of a lease to Casey, and Count Five.  Those aspects of plaintiffs' case will be deferred pending resolution of the pertinent administrative appeals.  The court expresses no opinion as to the merits of these counts.  *See id.* at 1060-61.

C. *Whether the Plaintiffs Have Standing to Assert Breach of Trust Claims Arising Prior to BIA's 2013 Final Probate Order*

The government argues that plaintiffs lack standing to assert breach of trust claims arising prior to BIA's 2013 final probate order.  In the government's view, that probate order vested the plaintiffs with property rights, but until that time the plaintiffs did not have a "legally protected interest" in their deceased father's assets within the meaning of *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  Def.'s Mot. at 8 (citing *Lujan*).

A plaintiff must have standing for a court to exercise jurisdiction over his or her claims. *Bannum, Inc. v. United States*, 115 Fed. Cl. 257, 269 (2014) ("Standing is a question of subject matter jurisdiction.") (quoting *Archura LLC v. United States*, 112 Fed. Cl. 487, 497 (2013) (in turn  citing *S. Cal. Fed. Sav. & Loan Ass'n v. United States*, 422 F.3d 1319, 1328, n.3 (Fed. Cir. 2005))).  To establish standing, a plaintiff must show (1) an injury-in-fact, meaning "an invasion of a legally protected interest that is . . . concrete and particularized" and "'actual or imminent, not conjectural or hypothetical;'" (2) that there is "a causal connection between the injury and the conduct complained of;" and (3) that it is "'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'"  *Lujan*, 504 U.S. at 560-61 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990); *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 38, 42 (1976)); *see also Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1358-59 (Fed. Cir. 2009) ("The Court of Federal Claims, though an Article I court, . . . applies the same standing requirements enforced by other federal courts created under Article III.") (quoting *Anderson v. United States*, 344 F.3d 1343, 1350 n.1 (Fed. Cir. 2003)).

 The inquiry into standing is separate from the merits inquiry, and it requires the court to assume the merits of the plaintiff's case.  *See Warth v. Seldin*, 422 U.S. 490, 500-01 (1975) (finding that "standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal" and holding that when deciding standing, "courts must accept as true all material allegations of the complaint"); *see also Amador Cnty. v. Salazar*, 640 F.3d 373, 378 (D.C. Cir. 2011) (same).

In Indian heirship cases "[t]he first element [of *Lujan*] is satisfied if the plaintiffs in this action were the persons deprived of an interest in real property or if they are entitled to represent persons deprived of an interest in real property."  *Wilkinson*, 440 F.3d at 977 (holding Indian heirs had standing to bring claims that BIA improperly permitted leasing of Indian trust land in the Fort Berthold Reservation during probate and prior to the final probate order); *see also Hodel v. Irving*, 481 U.S. 704, 711 (1987) ("[The statute] has deprived appellees of the fractional interests they otherwise would have inherited.  This is sufficient injury-in-fact to satisfy Article III of the Constitution.").  "To determine whether the plaintiffs were deprived of an interest in real property, we need only trace ownership of the leased allotments to confirm that the plaintiffs

received, or should have received" their interests.  *Wilkinson*, 440 F.3d at 977.

Applying this rule, the court in *Wilkinson* considered the case of Indian heirs who contested BIA's action in leasing land during probate proceedings.  Like the Fredericks heirs, the Wilkinson heirs alleged that BIA improperly permitted leases on the land during probate, before the final probate order.  440 F.3d at 972-74.  Considering claims under the Federal Tort Claims Act and the Constitution, the *Wilkinson* court found that the plaintiffs satisfied the first *Lujan* element because "the identified allotments . . . that were subject to the BIA's seizure and leasing should have passed to the plaintiffs in this case."  *Id.* at 977.  Contrary to the government's view of the law, the *Wilkinson* court observed that the Eighth Circuit had previously held that "prospective Indian heirs had Article III 'injury in fact' standing even though they suffered only injury to prospective possessory interests."  *Id.* at 978 (citing *Irving v. Clark*, 758 F.2d 1260, 1267 n.12 (8th Cir. 1985).[6]

The plaintiffs here received vested remainders in their father's land, and they allege that these interests would have been greater but for the government's violations of law during probate.  Put another way, they have alleged that the government's conduct "deprived" them of an interest "they otherwise would have inherited."  *Irving*, 481 U.S. at 711.  That is "sufficient" for standing.  *Id.*  The fact that BIA probate proceedings delayed the confirmation or announcement of their interests makes no difference.

The plaintiffs bring these claims in their own right, not necessarily on behalf of their late father, and so it is not necessary to consider third-party prudential standing.  But in the

---

[6]The Eighth Circuit in *Wilkinson* considered that the heirs' prospective possessory interests in their decedent's allotted lands sufficed to establish standing.  *Wilkinson*, 440 F.3d at 977-78.  The question of when property rights vest in Indian heirs was not actually before the court, and the court's holding shows that vesting *vel non* is not relevant to its holding on standing.  In a supplemental brief filed after the hearing, the government argues that *Wilkinson* applies only when the plaintiff is an heir to a "present possessory interest," Def.'s Supp. Br. at 5, ECF No. 39-1, noting that the plaintiffs in *Wilkinson* were heirs to present possessory interests, not remainder interests.  That circumstance, however, did not provide the basis for the holding in *Wilkinson*.  Instead, the court of appeals ruled that the first *Lujan* element "is satisfied if the plaintiffs" are "persons deprived of *an interest* in real property."  *Id.* at 977 (emphasis added).  The holding was not limited to heirs with a present possessory interest, and the government's strained effort to distinguish *Wilkinson* is unavailing.  Moreover, the Eighth Circuit commented that
> [d]elays in probate proceedings prevented the[] property rights from vesting in the heirs of Ernest and Virginia.  The BIA continued to lease the lands well after probate should have been concluded and interests should have vested in the heirs.  We refuse to allow the government to delay the disposition of estates and then rely on the consequences of those delays to claim that prospective heirs lack protectable interests.

*Id.* at 977.  The facts in this case are comparable to those in *Wilkinson*.

9

alternative, and to the extent plaintiffs are viewed as representatives of their father's estate during the probate period, the court finds that plaintiffs also have prudential standing to bring claims as third-party representatives of their deceased father. As the Eighth Circuit observed in *Wilkinson*,

> [f]or obvious reasons, it has long been recognized that the surviving claims of a decedent must be pursued by a third party. At common law, a decedent's surviving claims were prosecuted by the executor or administrator of the estate. For Indians with trust property, statutes require the Secretary of the Interior to assume that general role. The Secretary's responsibilities in that capacity, however, include the administration of the statute that the appellees claim is unconstitutional, so that he can hardly be expected to assert appellees' decedents' rights to the extent that they turn on that point.

*Wilkinson*, 440 F.3d at 977 (quoting *Irving*, 481 U.S. at 711-12 (citations omitted)). Likewise, the Indian heirs in this case are the only ones positioned to enforce claims for violations of law and breach of trust duties occurring during the probate period.

Both parties have briefed arguments about when the United States' trust responsibilities began, the extent of trust property, and the scope of the government's duty as a trustee. Def.'s Mot. at 11-12 (citing *Inter Tribal Council of Arizona, Inc. v. Babbitt*, 51 F.3d 199, 203 (9th Cir. 1995), and *Quapaw Tribe of Oklahoma v. United States*, 111 Fed. Cl. 725, 731-32 (2013)). These arguments address the merits, not standing, and the court will not now consider them.

For the reasons stated, the plaintiffs have met the first element of *Lujan*. The second and third elements of *Lujan* are not seriously contested. The alleged injuries are traceable to the United States, and they could be redressed by money damages. Accordingly, plaintiffs have standing to assert claims arising prior to BIA's final probate order entered July 11, 2013.

D. *Whether Plaintiffs Have Standing to Assert a Fifth Amendment Challenge to the American Indian Probate Reform Act of 2004*

Count Four of the complaint alleges that the American Indian Probate Reform Act ("AIPRA") of 2004, Pub. L. No. 108-374, 118 Stat. 1773 (codified in scattered sections of Title 25 of the United States Code, including 25 U.S.C. § 2206), which amended the Indian Land Consolidation Act ("ILCA"), Pub. L. No. 97-459, tit. II, 96 Stat. 2517 (codified as amended, at 25 U.S.C. §§ 2201-2221), led to a Fifth Amendment taking by permitting life tenants to waste the land, attendant minerals, and associated assets. In particular, an amendment made by AIPRA to ILCA changed the law to provide that

> if the decedent is survived by 1 or more eligible heirs described in subparagraph (B)(i), (ii), (iii), or (iv), *the surviving spouse shall receive* 1/3 of the trust personalty of the decedent and a *life estate without regard to waste in the interests in trust or restricted lands of the decedent.*

25 U.S.C. § 2206(a)(2)(A)(i) (emphasis added).  Mr. Fredericks' children, including the plaintiffs, are individual heirs within the meaning of Subparagraph (B), Clause (i) of Paragraph 2206(a)(2), so the provision regarding descent to a surviving spouse quoted above applies to this case.  The plaintiffs challenge the viability of the Clause calling for receipt by the surviving spouse of a "life estate without regard to waste" on the ground that the statutory change could, and in this instance allegedly would, substantially diminish their remaindermen's interest in Mr. Fredericks' property.  Pls.' Opp'n at 17-20.  And specifically, "without regard to waste" is statutorily defined to mean "with respect to a life estate interest in land, that the holder of such estate is entitled to the receipt of all income, including bonuses and royalties, from such land to the exclusion of the remaindermen."  25 U.S.C. § 2201(10).  Prior to the amendment, a life tenant would be paid interest on the proceeds from a mineral lease, with the principal, *i.e.*, the proceeds themselves, going to the remaindermen.  *See* 25 C.F.R. § 179.4 (2006).  Thus, in this case, application of the amended statute would mean that Judy as the surviving spouse would receive all of the bonuses and royalties from the Oil Lease, to the exclusion of plaintiffs, during Judy's lifetime.

Following the enactment of ILCA in January 1983, Indian heirs have filed a variety of takings challenges to the Act and its various amendments, including two cases decided on the merits by the Supreme Court.  *See Irving*, 481 U.S. at 711-14 (addressing a challenge to a provision that required small fractional allotment interests to escheat to tribe, barring descent to heirs); *see also Babbitt v. Youpee*, 519 U.S. 234, 243 (1997) (considering a challenge to similar amendments); *Klauser v. Babbitt*, 918 F. Supp. 274, 279 (W.D. Wisc. 1996) (same).  In all of these cases, the courts found the plaintiffs had standing to represent their deceased family member, and for the same reasons expressed in those cases, this court finds the plaintiffs have standing to challenge the "life estate without regard to waste" provision of ILCA as amended by the AIPRA.

## ANALYSIS

The government has moved to dismiss all counts of plaintiffs' amended complaint pursuant to RCFC 12(b)(6).  Def.'s Mot. at 16.  Although the captions in and appendix to the government's brief suggest that defendant has requested dismissal under Rule 12(b)(6) only of Count 4 and the post-July 11, 2013 claims, *see* Def.'s Mot. at i, the government alternatively has treated its standing arguments as grounds for a motion to dismiss for failure to state a claim.  Def.'s Mot. at 16.  Plaintiffs have responded to all of defendant's arguments.  Pls.' Resp. at 11, 18.  For these reasons, the court now considers whether each count of the complaint states a claim upon which relief could be granted under RCFC 12(b)(6).

The government acknowledges that it served as a statutory trustee of the property at issue.  *See* Def.'s Reply at 1-2 (arguing the government's trust duties were owed to the decedent's estate, not the Indian heirs); Def.'s Mot. at 13 (acknowledging the decedent's "trust" lands); Hr'g Tr. 31:12-22 (conceding the existence of a trust, but disputing the existence of

money-mandating duties).[7] The government's argument is that it held the property in trust for the benefit of decedent's estate, and not the plaintiffs, until the BIA's final probate order on July 11, 2013. *See* Def.'s Mot. at 16 ("As set forth [in the government's standing arguments], plaintiffs have failed to allege facts that, if true, establish they had a beneficial property interest in their father's estate before July 11, 2013."). As a secondary argument, the government contends that its conduct was authorized by law, and that the plaintiffs "lacked authority to approve or disapprove leases" made by the government during and after probate. Def.'s Mot. at 11, 18. The plaintiffs disagree, arguing that their property interest as heirs vested upon the death of the decedent parent, Pl.'s Opp'n at 7-8, and that the statutes create fiduciary duties owed to Indian heirs, *id*. at 12 (discussing mineral rights).

      A.  *Whether the Heirs' Interests Were Cognizable Prior to the Final Probate Order of July 11, 2013*

Plaintiffs assert that a decedent's property interests necessarily vest in his or her heirs upon death, and that probate only "confirms [that] title already passed to the heirs." Pls.' Opp'n at 8. Plaintiffs rely primarily on the common law to advance this point. *Id*. at 8-9 (citing state common law cases). In reply, the government argues that this court cannot apply common law standards and must decide the question by examining federal statutes. Def.'s Reply at 10 ("The answer to that question is governed by federal law and AIPRA, not by the common law or state law.").

Although AIPRA contains provisions relating to tribal probate codes, 25 U.S.C. § 2205, and to descent and distribution, 25 U.S.C. § 2206, the court has found no federal statute or regulation that speaks to *when* a decedent's interest vests in his or her heirs. The government has conceded this point. *See* Hr'g Tr. 8:11-15 (The Court: . . . Does any provision of the American Indian Probate Reform Act say when interests vest in an heir? Mr. Bean: . . . [B]y statute, I don't believe that is defined."). The only authorities available – decisions by the Interior Board of Indian Appeals – all hold that when a person dies intestate, title "vests in his or her heirs on the date of death, not the date of the probate order." *Smartlowit v. Northwest Reg'l Dir.*, 50 I.B.I.A. 98, 106 (2009) (collecting cases). These Board decisions are directly contrary to the government's current contention.

Moreover, the *Smartlowit* decision is consistent with the traditional common law rule that "[if] the interest of the beneficiary is real property, it passes on his death intestate to his heirs." *Restatement (Second) of Trusts* § 142 cmt. a (1959). Although the government asserts that the common law cannot apply, this assertion is directly contradicted by the Supreme Court's holding that "when Congress has not spoken 'in an area comprising issues substantially related to an established program of government operation,'" then the court must "fill the interstices of federal legislation 'according to [federal common law].'" *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 727 (1979) (quoting *United States v. Little Lake Misere Land Co.*, 412 U.S. 580, 593 (1973); *Clearfield Trust Co. v. United States*, 318 U.S. 363, 367 (1943)); *see also Montana v.*

---

[7]Pursuant to 25 U.S.C. § 2206(a)(5), "a trust or restricted interest in land or trust personalty that descends under the provisions of this subsection shall vest in the heir in the same trust or restricted status as such interest was held immediately prior to the decedent's death."

12

*United States*, 124 F.3d 1269, 1274 (Fed. Cir. 1997) (explaining the *Kimbell* doctrine).[8]  The fact that the case involves Indian property rights does not alter this analysis.  *Wilson v. Omaha Indian Tribe*, 442 U.S. 653, 671-74 (1979) (applying *Kimbell* and adopting the law of Nebraska as federal common law to determine the boundaries of a river along an Indian reservation).[9]

In this case, federal statutes provide for Indian probate proceedings, but they do not speak to when the rights of heirs vest.  Filling this gap, the common law, IBIA decisions, the law applied by states, and the traditional common law all provide that an heir's real property rights vest on the death of their ancestor.  *See Brooks v. Bogart*, 231 N.W. 2d 746, 752 (N.D. 1975) ("It is settled law that the real property in an intestate's estate devolves to the heirs according to the intestate succession statutes immediately upon the intestate's death."); *In re Estate of Todman*, 2006 WL 3940589, at *4 (Super. Ct. V.I. Dec. 17, 2006) (surveying the common law "as generally understood and applied in the United States" and determining that "upon the death of a person, his or her property vests, *eo instanti*, in his or her heirs or distributees"); *Restatement (Second) of Trusts* § 142 cmt. a (reciting the traditional common law rule that "[if] the interest of the beneficiary is real property, it passes on his death intestate to his heirs, subject to the claims of creditors, in accordance with the rules governing the devolution of legal interests which are real property").[10]  On the basis of these common law rules, the Supreme Court itself has held that, as a matter of federal common law, heirs' interests vest on death.  *Binney v. Long*, 299 U.S.

---

[8] Under *Kimbell*, the court should choose either state law or traditional common law as the federal common law rule of decision.  *Kimbell*, 440 U.S. at 728.  But in cases where both state law and traditional common law reach the same result, the court need not make a choice of law.  *See New York v. National Serv. Indus., Inc.*, 460 F.3d 201, 206 (2d Cir. 2006) ("[W]e need not decide this question because the outcome would be the same whether we apply state law or a national rule derived from traditional common-law principles.") (Sotomayor, J.).

[9] The Supreme Court has "borrowed state law in Indian cases before," even in cases involving Indian property rights.  *Omaha Indian Tribe*, 442 U.S. at 674 (citing *Board of Comm'rs v. United States*, 308 U.S. 343 (1939)).

[10] This court's reliance on *Kimbell* and common law on this question does not contravene the Supreme Court's 2011 holding that a "trust is defined and governed by statutes rather than the common law."  *Jicarilla Apache Nation*, 131 S. Ct. at 2323.  This court is not relying on common law to determine the existence of trust responsibilities enforceable by money damages in breach.  Instead, this court is determining when interests that are admittedly held by the plaintiffs vested.  *Jicarilla* was primarily concerned with courts using the common law to impose particular trust duties, for example a common law fiduciary duty to manage resources to maximize return, when the statutes themselves did not impose such a duty.  *Id.* (citing *United States v. Navajo Nation*, 537 U.S. 488, 507-08 (2003), for the proposition that the "Indian Mineral Leasing Act" did not permit a breach of trust suit since the Act imposed no "detailed fiduciary responsibilities" nor "responsibility to secure the needs and best interests of the Indian owner.").  Moreover, the issue of when a property interest in a trust vested is viewed separately from the issue of whether the government breached its fiduciary duties.  *See Lebeau v. United States*, 474 F.3d 1334, 1342-43 (Fed. Cir. 2007) (after the government conceded a breach of trust, the court analyzed whether plaintiffs had a vested property interest, finding they did not).

280, 287 (1936) (discussing "the common law and the law as declared by this court" and concluding that an interest vested upon an intestate's death) (citing *Wright v. Blakeslee*, 101 U.S. 174, 176-77 (1879), for the proposition that an interest vested upon death, as an application of federal common law in determining tax consequences under the then-existing Internal Revenue Code)).

In light of this analysis, this court accepts the conclusion of the IBIA that Indian heirs' property interests vest upon the death of their ancestor. *See, e.g.*, *Smartlowit*, 50 I.B.I.A. at 106; *see also Globe Indem. Co. v. Bruce*, 81 F.2d 143, 150 (10th Cir. 1935) (interpreting federal Indian probate law for the Osage Nation and finding "a present equitable interest in the lands, moneys and mineral interests vested in the members of the tribe and on the death of a member descends to his heirs"). A probate court's "decree of distribution vests or grants no title, but merely releases the property from probate and confirms the title already passed to the heirs or beneficiaries." *Kellar v. Kasper*, 138 F. Supp. 738, 741 (D.S.D. 1956) (interpreting South Dakota probate law in a case not involving BIA). Accordingly, plaintiffs' property interests vested upon the death of their father.

  B. *Whether Any Statutes Imposed Fiduciary Duties Upon the Government in Favor of Indian Heirs*

The government next argues that it did not violate any statutorily imposed trust duties, namely because the plaintiffs lack leasing authority. Def.'s Mot. at 10-12; Def.'s Reply at 5. "To establish that the United States has accepted a particular fiduciary duty, an Indian tribe must identify statutes or regulations that both impose a specific obligation on the United States and bear the hallmarks of a conventional fiduciary relationship." *Hopi Tribe v. United States*, 782 F.3d 662, 667 (Fed. Cir. 2015) (quotation marks and citation omitted). Courts have found statutory trusts when statutes or regulations that imposed "comprehensive responsibilities" on the government required the government to consider the needs and best interests of Indians, and required the delivery or disposition of assets to the Indians. *Id.* (citing *United States v. Mitchell*, 463 U.S. 206, 220 (1983)). Courts have also found statutory trusts when the statutes declared the existence of a trust and authorized the government "to use the land exclusively." *Id.* at 668 (citing *White Mountain Apache Tribe*, 537 U.S. at 475, which held that under such circumstances the government was under a duty to preserve improvements to Indian land).

Because plaintiffs' claims under the Fort Berthold Mineral Leasing Act have not been prudentially exhausted, the court considers only plaintiffs' claims under AIARMA. These allegations include conduct both before and after the BIA's 2013 final probate order.

  1. *Permits and leases during probate.*

As a threshold rule, Indian lands cannot be leased to or otherwise encumbered in favor of non-Indians without federal approval. *See* 25 U.S.C. § 177; *see also City of Sherrill v. Oneida Indian Nation of New York*, 544 U.S. 197, 204 (2005) (tracing this statute to 1790, when it was enacted as "a policy protective of" Indians by "undertaking to secure the Tribes' rights to reserved lands"). From time to time, Congress has passed specific leasing acts authorizing Indians to lease their lands. *See, e.g.*, Act of February 28, 1891, § 3, 26 Stat. 795 (codified at 25

U.S.C. § 397) (permitting a tribal council to lease lands "not needed for farming or agricultural purposes," subject to Secretarial approval). Another such act is the Indian Long-Term Leasing Act of 1955, codified today at 25 U.S.C. §§ 415, 415a-415d. *See* Felix Cohen, *Cohen's Handbook of Federal Indian Law* § 17.02[4] (2012) ("*Cohen's Handbook*"). Section 415 authorizes Indian owners and tribes to lease their restricted lands for up to 25 years, subject to the approval of the Secretary of the Interior. If an Indian owner dies, Section 415a authorizes leasing of "restricted lands . . . under sections 415 to 415d of this title, for the benefit of their heirs or devisees, in the circumstances and by the persons prescribed in section 380 of this title." 25 U.S.C. § 415a. Section 380 provides that "restricted allotments of deceased Indians may be leased, except for oil and gas mining purposes, by the superintendents of the reservation within which the lands are located . . . when the heirs or devisees of such decedents have not been determined." Accordingly, the Indian Long-Term Leasing Act creates a scheme for leasing by Indians and by the government on behalf of Indian heirs.

In 1990, Congress enacted the AIARMA, codified, as amended, at 25 U.S.C. §§ 3701-3746. AIARMA generally empowers the Secretary to help tribes manage agricultural lands. *See* 25 U.S.C. § 3702 ("The purposes of this chapter are to . . . carry out the trust responsibility of the United States . . . by providing for the management of Indian agricultural lands," and to "authorize the Secretary to take part in the management of Indian agricultural lands, with the participation of the beneficial owners of the land, in a manner consistent with the trust responsibility of the Secretary."). For example, AIARMA authorizes the Secretary to work with Indian tribes to develop and implement 10-year agricultural resource management plans. 25 U.S.C. § 3711(b)(1).

But AIARMA also amended the scheme established by the Indian Long-Term Leasing Act, creating new rules for leases and permits of agricultural land. AIARMA empowers the Secretary to approve agricultural leases or permits "of up to 10 years," as contrasted to the 25-year term specified in Section 415, although the Secretary may still authorize a 25-year lease if it is in the best interests of the Indian landowners and when such lease requires a substantial investment by the lessee. 25 U.S.C. § 3715(a)(1). This leasing authority may be exercised by "individual owners" of allotments, or by tribes. 25 U.S.C. § 3715(c). For "owners of a majority interest," meaning greater than 50 percent of legal or beneficial title, the act authorizes them to "enter into an agricultural lease of the surface interest of a trust or restricted allotment" that is binding upon the minority of owners, if the lease provides those minority interest holders with at least "fair market value" for the land. 25 U.S.C. § 3715(c)(2)(A).

In 2001, the Interior Department promulgated regulations implementing AIARMA, codifying those rules at 25 C.F.R. §§ 162 (leases) and 166 (permits), amending earlier regulations adopted under 25 U.S.C. § 415. The "overall leasing program" is thus "administered under the authority of AIARMA in combination with the Indian Long-Term Leasing Act, 25 U.S.C. § 415." 66 Fed. Reg. 7068, 7079 (2001); *see also Cohen's Handbook* § 17.02[5][c] ("Most modern agricultural and grazing leases are made under authority granted by a combination of provisions of AIARMA and the Indian Long-Term Leasing Act."). As part of this rulemaking, the Interior Department promulgated 25 C.F.R. § 162.209(a)(3), which provides that BIA "may grant an agricultural lease on behalf of . . . undetermined heirs and devisees of deceased Indian owners," and 25 C.F.R. § 166.205(a)(4), which provides that BIA may grant

permits under the same circumstances. *See also Spang v. Acting Rocky Mountain Reg'l Dir.*, 52 I.B.I.A. 143, 150-51 (citing 25 U.S.C. § 380 for the proposition that the Secretary may grant agricultural leases under certain circumstances).

Here, the government argues the Secretary had authority to grant permits during probate, and that the granting of permits alone thus cannot be a breach of fiduciary duty. Sections 380 and 415a provide the government with authority to promulgate 25 C.F.R. § 162.209(a)(3) and 25 C.F.R. § 166.205(a)(4).[11] For this reason, the government is correct that it had authority to grant permits and leases during probate.

But this does not mean the plaintiffs have failed to state a breach of duty claim under AIARMA and its regulations. The Federal Circuit has held that Section 415 and the pre-2001 regulations set out in 25 C.F.R. Part 162 imposed money-mandating fiduciary duties on the United States. *Brown v. United States*, 86 F.3d 1554, 1561-62 (Fed. Cir. 1996). In that case, the court held that the plaintiffs could state a claim for breach of fiduciary duty when the Secretary failed to investigate alleged breaches in a lease and failed to cancel the lease after the alleged breaches. *Id.* at 1563. More recently, this court has held that 25 C.F.R. Part 162 imposes fiduciary duties upon the government that are money-mandating in breach, including a duty to monitor and ensure a lessee's compliance with an Indian lease and a duty to take remedial action if it discovers noncompliance. *Oenga v. United States*, 91 Fed. Cl. 629, 637-40 (2010) (finding the leasing regulations imposed a fiduciary duty on the United States to monitor leasing activity for compliance with the law, and entering summary judgment against the United States for breach of duty). Post-2001, Part 166 imposes for permits "substantively the same" duties on the government as Part 162 does for leases. 66 Fed. Reg. at 7080; *Cohen's Handbook* § 17.02[5][c] n.84. Thus, Part 166 contains language that is nearly identical to the provisions of Part 162

---

[11]Section 380 of title 25 provides that —

> Restricted allotments of deceased Indians may be leased, except for oil and gas mining purposes, by the superintendents of the reservation within which the lands are located (1) when the heirs or devisees of such decedents have not been determined and (2) when the heirs or devisees of the decedents have been determined, and such lands are not in use by any of the heirs and the heirs have not been able during a three-months' period to agree upon a lease by reason of the number of the heirs, their absence from the reservation, or for other cause, under such rules and regulations as the Secretary of the Interior may prescribe. The proceeds derived from such leases shall be credited to the estates or other accounts of the individuals entitled thereto in accordance with their respective interests.

25 U.S.C. § 380.

Section 415a of title 25 provides that "[r]estricted lands of deceased Indians may be leased under sections 415 to 415d of this title, for the benefit of their heirs or devisees." 25 U.S.C. § 415a.

16

considered in *Oenga*. *See* 25 C.F.R. § 166.701 (requiring the government to monitor and "ensure that the permittee is in compliance" with permit "requirements," "to protect the interests of the Indian landowners"); 25 C.F.R. § 166.705 (setting forth the government's remedial powers).

Surveying this regulatory landscape, the court finds that 25 U.S.C. §§ 380, 415, 415a, and 3715, in addition to the above-cited provisions of 25 C.F.R. Parts 162 and 166, impose specific and extensive duties on the government in favor of Indians and Indian heirs, money-mandating in breach. These statutes and regulations give the government responsibility over trust and restricted assets and empower the government to enter leases on behalf of Indians. This power must be exercised "for the benefit of [a deceased Indian's] heirs." 25 U.S.C. § 415a. These are "specific obligation[s]" that bear "the hallmarks of a conventional fiduciary relationship." *Hopi Tribe*, 782 F.3d at 667 (quoting *Navajo Nation*, 556 U.S. at 301). As a trustee, the government's decision to authorize a lease benefiting only one heir, and not the remaining heirs, could violate the statutory requirement that leases be for the benefit of heirs. 24 U.S.C. § 415a; *see also Restatement (Second) of Trusts*, § 183 ("When there are two or more beneficiaries of a trust, the trustee is under a duty to deal impartially with them.").[12]

Turning to the plaintiffs' factual allegations, the amended complaint alleges that the government authorized leasing or permitting in favor of Judy alone, and without regard to the remaindermen. Am. Compl. ¶¶ 16-19. Plaintiffs thus state a plausible claim for breach of fiduciary duty.

2. *Oversight of leasing and permitting.*

Plaintiffs additionally allege that the government improperly granted Judy a grazing permit during probate, and that Judy sub-leased or sub-permitted the land during that time and that her lessee or permittee damaged the land. Am. Compl. ¶¶ 16-19. As discussed *supra*, 25 C.F.R. §§ 162 and 166 impose fiduciary duties upon the government, including a duty to monitor and ensure third-party compliance with an Indian lease and a duty to take remedial action when and where breaches of significance occur. *See Oenga*, 91 Fed. Cl. at 637-40; *see also Brown*, 86 F.3d at 1561-62. Relevant here, Parts 162 and 166 impose upon the government a duty to administer and approve subleases, 25 C.F.R. §§ 162.241-.246, 166.229, and to consider "the best interest of the Indian owners" before permitting an assignment or sublease, 25 C.F.R. § 162.243; *see also* 25 C.F.R. § 166.224. Agricultural leases and permits must also include indemnity clauses that hold "the Indian landowners harmless from any loss, liability, or damages resulting from the tenant's use or occupation of the leased premises." 25 C.F.R. § 162.238; *see also* 25 C.F.R. § 166.207. Accordingly, plaintiffs' allegations – that Judy subleased the land to Mr. Gullickson, who in turn damaged it – state a plausible claim for relief.

---

[12]Having found statutorily imposed trust duties, the common law may play a role in the court's analysis. *See Hopi Tribe*, 782 F.3d at 668 (citing *White Mountain Apache Tribe*, 537 U.S. at 475 (in turn citing *Restatement (Second) of Trusts* for the proposition that the United States had a duty to preserve trust assets, after having determined that a trust relationship existed under money-mandating statutes)).

17

3. *Surface leasing after probate.*

Since the final decision in probate was entered in 2013, plaintiffs contend that the government has deprived them of leasing rights under 25 U.S.C. § 3715(c) by allowing Judy to execute surface leases without plaintiffs' consent. Am. Compl. ¶ 31; Pls.' Resp. at 25. Subsection 3715(c) empowers a majority of owners to lease their lands, subject to the approval of the government. Given the government's duty to approve and supervise leasing activity, the government's outright denial of plaintiffs' right to lease their lands arguably constitutes a breach of fiduciary duty. *Cf. Oenga*, 91 Fed. Cl. at 637-40; *see also Brown*, 86 F.3d at 1561-62. Accordingly, the court finds plaintiffs have stated a claim for breach of fiduciary duty.

In reaching this conclusion, the court is not persuaded by the government's argument that 25 C.F.R. § 162.004(b)(1) authorizes Judy to enter leases without the consent of remaindermen. *See* Def.'s Reply at 16-18. The cited regulation provides that "[w]hen all of the trust or restricted interests in a tract are subject to a single life estate, the life tenant may lease the land without the consent of the owners of the remainder interests . . . for the duration of the life estate." 25 C.F.R. § 162.004(b)(1). But that regulation also imposes duties on the government in favor of remaindermen. *See* 25 C.F.R. § 162.004(b)(1)(i) ("The lease will terminate upon the death of the life tenant."); 25 C.F.R. § 162.004(b)(1)(iv) ("We may monitor the use of the land on behalf of the owners of the remainder interests."); 25 C.F.R. § 162.004(b)(1)(vi) ("We will be responsible for enforcing the terms of the lease on behalf of the owners of the remainder interests."). Moreover, 25 C.F.R. § 162.004(b)(2) provides that the remaindermens' consent is required when "less than all" of the trust land is subject to a single life estate. Given the fact-intensive nature of these regulations, this issue can only be addressed after the parties have been able to develop the factual record, including facts regarding the precise nature and extent of the leases, the life estate, and the remainder interests. Plaintiffs state a plausible claim under AIARMA, and thus they have met their pleading burden under RCFC 12(b)(6).[13]

C. *Takings Claim*

Plaintiffs bring a Fifth Amendment claim, challenging AIPRA and its amendments as implemented by the BIA. Am. Compl. ¶¶ 73-82. In particular, plaintiffs challenge AIPRA's provisions granting a surviving spouse a life estate without regard to waste. Am. Compl. ¶ 75 (citing 25 U.S.C. § 2201(10)); Pl.'s Opp'n at 23 (citing 25 U.S.C. § 2206(a)(2)(D)). To determine whether a plaintiff has stated a plausible taking claim, the court first "determines whether the claimant has identified a cognizable Fifth Amendment property interest that is asserted to be the subject of the taking. Second, if the court concludes that a cognizable property interest exists, it determines whether that property interest was 'taken.'" *Aviation & General Ins. Co. v. United States*, 121 Fed. Cl. 357, 362 (2015) (quoting *Acceptance Ins. Cos. v. United States*, 583 F.3d 849, 854 (Fed. Cir. 2009)).

---

[13]Plaintiffs have argued that 25 C.F.R. § 162.004(b)(1) may be invalid to the extent it is inconsistent with 25 U.S.C. § 3715(c). Am. Compl. ¶ 70. Given the court's resolution of the motion to dismiss, the court need not now address whether the regulation is proper under *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984).

Pursuant to the rationale of *Irving* and *Youpee*, the complaint plausibly states that the plaintiffs' and their father's interests in real property were taken by the government's action altering the scheme for intestate succession.

The plaintiffs have identified a cognizable property interest. Turning to the second step, plaintiffs allege these interests were diminished by the government's action, including BIA's probate order. Am. Compl. ¶ 81. These allegations are sufficient to state a plausible claim. *Cf. Irving*, 481 U.S. at 717 (finding on the merits that the abolition of devise and descent of certain types of Indian trust property constituted a taking). Although the parties make arguments under the multi-factor test of *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104 (1978), "[i]t would be premature to decide at this stage of the case [, *i.e.*, with a pending motion to dismiss under RCFC 12(b)(6),] whether [p]laintiffs' allegations should be resolved under . . . the *Penn Central* test for regulatory takings." *Alimanestianu v. United States*, 124 Fed. Cl. 126, 133 (2015) (concluding that plaintiffs had stated a takings claim without analyzing the claim under *Penn Central*). "While th[e *Penn Central*] factors may ultimately be relevant in deciding whether a taking has occurred, they do not assist the court in deciding whether [p]laintiffs have stated a plausible taking claim." *Aviation & General Ins.*, 121 Fed. Cl. at 366. Accordingly, the court finds plaintiffs have stated a claim under the Fifth Amendment.[14]

---

[14] In a footnote in the government's reply brief, the government suggests that plaintiffs' takings claim is barred by the six-year statute of limitations provided by 28 U.S.C. § 2501 because AIPRA went into effect in 2006 and the plaintiffs' lawsuit was filed in 2014. Def.'s Reply at 12 n.6. The government indicates that plaintiffs' claim may have accrued in 2006. Def.'s Reply at 12 n.6. In general, "a takings 'claim first accrues when all the events have occurred which fix the alleged liability of the government and entitle the plaintiff to institute an action.'" *Navajo Nation v. United States*, 631 F.3d 1268, 1273 (Fed. Cir. 2011) (quoting *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1577 (Fed. Cir. 1988)). "Therefore," a takings claim "accrues when the taking action occurs." *Id.* (quoting *Goodrich v. United States*, 434 F.3d 1329, 1333 (Fed. Cir. 2006)). If the only governmental action alleged is the legislature's enactment of a statute, then the plaintiff asserts a legislative taking, which accrues on the date of enactment. Under this rule, plaintiffs' Fifth Amendment claims would be barred to the extent the relevant portions of AIPRA became effective more than six years prior to the time plaintiffs filed suit. Even so, "a claim that the application of government regulations effects a taking of a property interest is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." *Williamson Cnty. Regional Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 186 (1985). In this instance, implementing regulations were required before the statutory provisions became operative, and those regulations appear to have become effective on June 20, 2006, *see* 70 Fed. Reg. 37,107 (June 28, 2005), but the probate was not completed until 2013. Given that the government's mode of raising this issue was via a footnote in a reply brief, to which plaintiffs have not had an opportunity to respond, the court declines to rule on the matter at this time.

## CONCLUSION

The government's motion to dismiss is DENIED in part and otherwise DEFERRED for prudential reasons, awaiting resolution of pending administrative proceedings.

On or before March 11, 2016, defendant shall file an answer to plaintiffs' amended complaint.

It is so ORDERED.

s/ Charles F. Lettow
Charles F. Lettow
Judge
